

**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: May 31, 2023.**

_Craig A. Gargotta_
_____
**CRAIG A. GARGOTTA**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| IN RE: | § | CASE NO. 21-51206-cag |
| | § | |
| VICTOR HUGO SANCHEZ, | § | CHAPTER 7 |
| | § | |
| Debtor. | § | |

| | | |
|---|---|---|
| DOCTORS HOSPITAL AT RENAISSANCE, LTD. AND RGV MED, LLC, | § § § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | ADV. NO. 22-05003-cag |
| | § | |
| VICTOR HUGO SANCHEZ, | § | |
| | § | |
| Defendant. | § | |

### MEMORANDUM OPINION AND ORDER REGARDING MOTIONS FOR SUMMARY JUDGMENT (ECF NOS. 29 AND 43)

Came on for consideration in the above-numbered and -styled adversary case two competing motions for summary judgment. Defendant Victor Sanchez ("Defendant" or

1

"Sanchez") filed his Motion for Summary Judgment ("Sanchez('s) MSJ") (ECF No. 29).[1] Plaintiffs Doctors Hospital at Renaissance, LTD. and RGV Med, LLC ("Plaintiffs" or "Hospital") then filed Plaintiffs' Motion for Summary Judgment ("Hospital('s) MSJ") (ECF No. 43). Both the Sanchez MSJ[2] and the Hospital MSJ[3] received full briefing, each triggering a response and reply.

## JURISDICTION

As an initial matter, the Court finds it has jurisdiction over this matter under 28 U.S.C. §§ 1334 (a) and (b). Venue is proper under 28 U.S.C. §§ 1408 and 1409. The bankruptcy court has authority to adjudicate this matter pursuant to the District Court's Standing Order of Reference. All parties have consented to this Court's authority to enter a final judgment in this adversary case. (ECF No. 19 (Sanchez) and 20 (Plaintiffs)).

## BACKGROUND AND ALLEGATIONS

Sanchez filed for Chapter 7 bankruptcy on October 4, 2021. The Hospital initiated this adversary proceeding on January 11, 2022. (ECF No. 1). Pretrial litigation and discovery ensued. Ultimately, the Hospital filed its Second Amended Complaint for Determination of Non-Dischargeability ("Complaint") (ECF No. 45). This version of the Complaint contains all allegations of the first amended complaint (ECF No. 8), minus allegations regarding the value of pieces of art. All parties agree the Complaint at ECF No. 45 is the operative complaint for purposes of summary judgment, even though all parties filed their MSJs before the Hospital amended the Complaint, because the Complaint contains no new allegations or causes of action. As such, the Court will disregard any argument and evidence presented regarding artwork valuation when

---

[1] "ECF" denotes electronic filing number.

[2] After the Sanchez MSJ, the Hospital filed Plaintiffs' Response to Defendant's Motion for Summary Judgment ("Sanchez MSJ Response") (ECF No. 36), and Sanchez filed his Reply to Plaintiffs' Response to Defendant's Motion for Summary Judgment ("Sanchez MSJ Reply") (ECF No. 41).

[3] After the Hospital MSJ, Sanchez filed his Response to Plaintiffs' Motion for Summary Judgment ("Hospital MSJ Response") (ECF No. 48), and the Hospital filed Plaintiffs' Reply in Support of Motion for Summary Judgment ("Hospital MSJ Reply") (ECF No. 49).

ruling on the motions for summary judgment.

The Complaint contends that the Court should deny Sanchez' discharge for violating 11 U.S.C. §§ 727(a)(2) and (a)(4).[4] The Hospital alleges that it obtained a final arbitration award in the amount of $482,202.98 plus pre- and post-judgment interest at 5% and had the award confirmed by the 332nd Judicial District Court in Hidalgo County. (ECF No. 45 at 3-4). While attempting to collect, the Hospital deposed Sanchez on June 29, 2021. (*Id.* at 4). Sanchez testified, in summary form, that he deposited his income into a bank account for Chioggia Oil & Gas, LLC ("Chioggia"). (*Id.* at 4-5). Sanchez earns this income as a monthly consulting fee from two entities he owns—Finek Texas, Ltd. ("Finek") and Financial Management International, Inc. ("FMI")— but the monthly amount varies. (*Id.* at 5). Once deposited in Chioggia's account, Chioggia uses the money to pay Sanchez' personal expenses. (*Id.* at 5-6).

The Hospital's MSJ argues that by depositing his income to Chioggia's bank account and using Chioggia to pay his personal expenses ("Chioggia scheme"), Sanchez fraudulently concealed assets from his creditors by diverting his income into an account beyond the scope of the Hospital's judgment in violation of § 727(a)(2). (ECF No. 43 at 1-2). Furthermore, the Hospital contends that Sanchez disobeyed § 727(a)(4)'s prohibition of false oaths because neither his pre-petition testimony regarding his income nor his bank statements can be reconciled with his income as reported on his bankruptcy Schedules. (*Id.* at 2). For these reasons, the Hospital asks the Court to deny Sanchez a discharge of any debt.

Sanchez' MSJ primarily argues that the Hospital does not have authority to bring this claim. Sanchez interprets the Hospital's Complaint as asserting an alter ego claim and contends that, within the Fifth Circuit, only a trustee has authority to pursue such a claim, unless the creditor

---

[4] All statutory references are to Title 11 of the United States Code unless otherwise specified.

makes certain showings. (ECF No. 29 at 8-10). Because only the trustee has authority to bring an alter ego claim, according to Sanchez, the Hospital has no standing, so the case must be dismissed. (*Id.*). Second, Sanchez argues that the Hospital cannot establish § 727(a)(4)'s fraudulent intent and materiality elements as a matter of fact or law. (*Id.* at 18-19). Therefore, Sanchez contends he is entitled to summary judgment in his favor on both § 727 claims.

Sanchez' MSJ also contains a list of undisputed facts. The Court hereby adopts those facts.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Bankruptcy Rule 7056 applies Rule 56(c) of the Federal Rules of Civil Procedure ("Rule(s)") to adversary proceedings. If summary judgment is appropriate, the Court may resolve the case as a matter of law. *Celotex Corp.*, 477 U.S. at 323; *Blackwell v. Barton*, 34 F.3d 298, 301 (5th Cir. 1994). The Fifth Circuit has stated "[t]he standard of review is not merely whether there is a sufficient factual dispute to permit the case to go forward, but whether a rational trier of fact could find for the non-moving party based upon evidence before the court." *James v. Sadler*, 909 F.2d 834, 837 (5th Cir. 1990) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

To the extent that the non-moving party asserts the existence of factual disputes, the evidence offered by the non-moving party to support those factual contentions must be of sufficient quality so that a rational fact finder might, at trial, find in favor of the non-moving party. *Matsushita*, 475 U.S. at 585–87 (1986) (non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts."); *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 249–50 (1986) ("adverse party's response . . . must set forth specific facts showing that there is a genuine issue for trial."). If the record taken as a whole, could not lead a rational trier of fact to find for the non-moving party, then there is no genuine issue for trial. ***LeMaire v. Louisiana***, 480 F.3d 383, 387 (5th Cir. 2007).

In determining whether a genuine issue of material fact exists, the nonmoving party must respond to a proper motion for summary judgment with specific facts demonstrating that such genuine issue exists. "[A] genuine issue of material fact is not raised by mere conclusory allegations or bald assertions unsupported by specific facts." ***Leon Chocron Publicidad Y Editora, S.A. v. Jimmy Swaggart Ministries***, 990 F.2d 1253 (5th Cir. 1993) (citation omitted).

## <u>ANALYSIS</u>

Section 727 of the Bankruptcy Code states:

(a) The court shall grant the debtor a discharge, unless— . . .

> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—
>
> > (A) property of the debtor, within one year before the date of the filing of the petition; or
> >
> > (B) property of the estate, after the date of the filing of the petition; [or]. . .
>
> (4) the debtor knowingly and fraudulently, in or in connection with the case—
>
> > (A) made a false oath or account;
> >
> > (B) presented or used a false claim;
> >
> > (C) gave, offered, received, or attempted to obtain money, property, or advantage, or a promise of money, property, or advantage, for acting or forbearing to act; or

5

**(D)** withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers, relating to the debtor's property or financial affairs; . . .

11 U.S.C. § 727(a)(2), (a)(4).

Section 727(a) provides that a court must grant a discharge unless one or more grounds for denial of discharge under § 727(a)(1)-(12) is proven to exist. The burden of proving a denial of discharge under § 727(a)(1)-(12) lies with the party objecting to discharge and the quantum of proof is preponderance of the evidence. ***Beaubouef v. Beaubouef (Matter of Beaubouef)***, 966 F.2d 174, 178 (5th Cir. 1992).

Both competing motions for summary judgment address standing and the elements of each § 727 claim. Because lack of standing would necessitate dismissal, the Court will address Sanchez' standing argument first. Then, the Court will address each claim in turn, including the arguments and evidence of each party.

**I.        The Hospital has standing to bring these § 727 claims.**

Sanchez contends that the Hospital does not have standing to bring these claims against him. (ECF No. 29 at 8-10). Citing ***In re Packer***[5], Sanchez argues the Fifth Circuit's holding that, absent specific showings he alleges the Hospital has not made, only the trustee has authority to bring alter ego claims. (*Id.*). Furthermore, Sanchez contends that the Hospital's "§ 727(a)(2) allegation and supporting facts are virtually identical to the creditor's § 727(a)(2) claim in [***Packer***]." (*Id.* at 7).

In the Sanchez MSJ Response, the Hospital contends that it is not required to establish an alter ego claim as part of the fraudulent concealment claim under § 727(a)(2). (ECF No. 36 at 13-14). The Hospital contrasts the facts in ***Packer***, noting that the creditor there specifically asked the

---

[5] ***Judgment Factors, LLC v. Packer (In re Packer)***, 816 F.3d 87 (5th Cir. 2016).

court to pierce the veil of a non-debtor entity so that the creditor could recover assets. (*Id.* at 13). Dissimilarly here, the Hospital does "not seek the relief sought by the creditor in *Packer* and assert no alter ego theory; Defendant's arguments to the contrary mischaracterize Plaintiffs' claims." (*Id.* at 14).

The Court takes judicial notice that neither the Complaint nor the Hospital's MSJ contain the words "alter ego" or "veil piercing." Yet, in the Sanchez MSJ Reply, Sanchez insists that the facts the Hospital pled regarding the Chioggia scheme assert an alter ego claim without labeling the claim. (ECF No. 41 at 2-3).

Both parties miss the forest for the trees. Whether a creditor surreptitiously asserts facts supporting an alter ego theory or outright labels those same facts as an alter ego theory are not relevant to a standing determination.

"A plaintiff has standing only if he can 'allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *California v. Texas*, 141 S.Ct. 2104, 2113 (2021) (citations omitted). Whether the cause of action belongs to the estate, or whether it may be pursued by a creditor, depends on whether the debtor could have raised the claim as of commencement of the case under applicable state law. *S.I. Acquisition, Inc. v. Eastway Delivery Serv., Inc. (Matter of S.I. Acquisition, Inc.)*, 817 F.2d 1142, 1142 (5th Cir. 1987). The Court must look to the nature of the injury for which relief is sought. *Schertz-Cibolo-Universal City, Indep. Sch. Dist. v. Wright (Matter of Educators Grp. Health Tr.)*, 25 F.3d 1281, 1284 (5th Cir. 1994) (citation omitted). When a cause of action only alleges indirect harm to a creditor, and the debtor could have raised a claim for its direct injury, then the cause of action belongs to the estate. *Highland Cap. Mgmt. v. Chesapeake Energy Corp. (In re Seven Seas Petroleum, Inc.)*, 522 F.3d 575, 584 (5th Cir. 2008). If a cause of action belongs to

7

the estate, then the trustee has exclusive standing to assert the claim. *Id.* "Conversely, if the cause of action does not explicitly or implicitly allege harm to the debtor, then the cause of action could not have been asserted by the debtor as of the commencement of the case, and is thus not property of the estate." *Educators*, 25 F.3d at 1284. In other words, for a creditor to have standing to pursue a claim, it must show direct injury suffered that is not dependent upon injury to the estate. *Meridian Cap. CIS Fund v. Burton (Matter of Buccaneer Res., LLC)*, 912 F.3d 291, 293-94 (5th Cir. 2019).

Numerous Fifth Circuit cases illustrate the difference between direct and derivative injuries. In *Seven Seas*, unsecured bondholders sued a consulting firm for providing false oil reserve estimates. 522 F.3d at 584. The bondholders relied on those estimates when deciding to invest in Seven Seas. *Id.* Because that induced reliance only injured the bondholders and not the Seven Seas, the injury was direct, and the bondholders had standing. *Id.* at 584-85. Similarly in *Buccaneer*, the debtor's former-but-fired CEO, Burton, sued secured creditor Meridian for tortious interference of contract, but Meridian argued the claim belonged to the estate. 912 F.3d at 293. The Fifth Circuit reasoned that the harm Burton suffered from an improper firing without severance does not depend on any harm suffered by the debtor; indeed, the circumstances of Burton's firing likely saved the Debtor money. *Id.* at 294. Because Burton's injury "flowed through Buccaneer's actions—allegedly taken at Meridian's request—but not through any injury to the debtor," the claim belonged to Burton. *Id.* By contrast, in *Educators*, the school districts alleged the defendants negligently managed a trust (the debtor entity), resulting in the trust becoming insolvent and unable to pay claims by school district employees. 25 F.3d at 1284-85. These claims belonged only to the estate because the mismanagement directly injured the debtor and only indirectly injured the school districts. *Id.*

This Court finds the Bankruptcy Court for the Eastern District of Texas' analysis in *Han*

8

*v. Coutts (In re Coutts)* particularly instructive. No. 21-40528, 2022 WL 3367711 (Bankr. E.D. Tex. July 1, 2022). Judge Searcy identified two questions that aid in determining whether a creditor-plaintiff has standing in a bankruptcy adversary case after reviewing Fifth Circuit cases. First, does the plaintiff allege any harm perpetrated *to the debtor* or only harm perpetrated *by the debtor*? *See Coutts*, 2022 WL 3367711, at *7 ("Plaintiffs do not allege any harm was perpetrated *to Debtor* as outlined in *Buccaneer*. Rather, they allege harm was perpetrated to Plaintiffs *by Debtor*.") (emphasis in original). Harm by the debtor is direct injury conferring standing. *Buccaneer*, 912 F.3d at 294-95. Second, does the plaintiff seek to recover any assets of the debtor or entities owned by the debtor to augment the estate? *See Coutts*, 2022 WL 3367711, at *7. ("Plaintiffs are not seeking to recover or control any assets of the Debtor or any of the entities scheduled as being owned by the Debtor. Rather, Plaintiffs seek to make their claim against those scheduled entities enforceable against Debtor because of Debtor's alleged fraud."). Recovering assets for the estate is within the Trustee's scope of authority—not a creditor's purview. § 704(a)(1); *Coutts*, 2022 WL 3367711, at *8.

Judge Searcy then analyzed *Packer*, finding it more factually similar to *Coutts* than other Fifth Circuit cases because both had individual debtors. Parthenon Development Partners, LLC, Packer, and two other members borrowed money to finance a residential development. *Packer*, 816 F.3d at 89. Packer and the other members guaranteed the loan. *Id.* Ultimately the lender foreclosed and obtained a deficiency judgment against Packer. *Id.* Judgment Factors, LLC (an entity owned by the spouses of Parthenon's other members) acquired the judgment against Packer. *Id.* After Packer filed chapter 7 bankruptcy, Judgment Factors sought to deny Packer's discharge under § 727. *Id.* at 90. In their complaint, Judgment Factors also asked the bankruptcy court to determine that Packer and other entities he owned but did not list in his schedules were alter egos

9

and to reverse pierce their corporate veils. *Id.*

Judge Searcy then concluded:

> In *Packer*, Plaintiffs claims were attempting, in part, to increase the pool of assets which might otherwise have been available for creditors. "Specifically, Judgment Factors argued that Packer should have listed the assets of these other entities in his bankruptcy schedules (because these entities were his 'alter egos') and that the bankruptcy court should determine that these assets were subject to the claims of Packer's creditors." [*Packer*, 816 F.3d at 90]. That fact pattern is different from this case, where Defendant does not seek relief touching upon recovery of any assets for the estate, and where there likely are no such assets to recover. For this reason, it does not seem consistent to read *Packer* as establishing a blanket rule that creditors have no standing in every case where alter ego is alleged, even if debtor is an individual. Nor does it seem consistent in light of the above guidance in *Buccaneer* and *Schimmelpenninck*, which both describe circumstances in which a creditor could possibly have standing.

*Coutts*, 2022 WL 3367711, at *8.

This Court finds Judge Searcy's detailed analysis in *Coutts* persuasive. Reading *Packer* the way Sanchez desires is contrary to decades worth of Fifth Circuit caselaw on the topic and drastically warps basic tenants of standing in American jurisprudence. What matters in a standing analysis is whether the Plaintiff alleges it suffered a cognizable injury caused by the defendant. *California*, 141 S.Ct. at 2113.

Here, the Hospital alleges that Sanchez caused the Plaintiffs injury by placing income he earned into Chioggia's bank account that was beyond the Hospital's reach to avoid satisfying the judgment against Sanchez, and that by lying on his Schedules the Hospital and other creditors did not have an accurate understanding of his financial affairs. (*See generally* ECF No. 45 at 3-6). In other words, the Complaint asserts Sanchez perpetrated the harm the Hospital suffered. The Court cannot find a single fact alleged the Complaint indicating Sanchez suffered any harm. Additionally, the Hospital does not seek to recover money to augment the estate. (*See* ECF No. 45 at 14 (prayer)). The prayer of the Complaint does not seek monetary recovery at all. *Id.* Notably,

unlike in *Packer*, the Hospital has not asked the Court to make an alter ego finding or pierce a corporate veil. The Hospital simply seeks to have Sanchez' discharge denied. *Id.* The Court concludes that the Hospital alleges it directly suffered an injury by Sanchez, and therefore, the Hospital has standing. For these reasons, all standing arguments in Sanchez' MSJ are DENIED.

## II.     § 727(a)(2) — Fraudulent Concealment

Having determined that the Hospital has standing to bring its § 727 claims, the Court will now address each claim, analyzing each element and related defenses in turn. To succeed on a § 727(a)(2) claim, the Hospital must establish by a preponderance of evidence (1) within one year of the date of filing, (2) the debtor or a duly authorized agent of the debtor, (3) transferred, removed, destroyed, or concealed any of the debtor's property, or permitted any of these acts to be done, (4) with the actual intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under the Bankruptcy Code. *Lowry v. Croft* (*In re Croft*), 500 B.R. 823, 851 (Bankr. W.D. Tex. 2013) (citing *Vill. of San Jose v. McWilliams*, 284 F.3d 785, 793–94 (7th Cir. 2002)).

### A.  Within One Year

Here, the Hospital produced deposition testimony in which Sanchez admitted the Chioggia scheme occurred within one year of filing the petition for bankruptcy. Sanchez filed for bankruptcy on October 4, 2021. (Case No. 21-51206, ECF No. 1). In a deposition on June 29, 2021, Sanchez testified that he continued to direct money from Finek to Chioggia as of that day. Sanchez Dep. 64:15-24, June 29, 2021.[6] Because Sanchez testified to the ongoing nature of the Chioggia scheme within one year of filing for bankruptcy, the Hospital has satisfied the first element.

---

[6] Both the Hospital and Sanchez attached Sanchez' June 29, 2021 testimony to their motions for summary judgment. The Hospital attached excerpts, but Sanchez attached the full transcript. For ease and clarity, the Court will cite to the transcript generally instead of referring to the Hospital's or Sanchez' exhibit specifically.

**B. Property of the Debtor**

Determining whether the Hospital carried its burden on the second element—property of the debtor—requires more detailed consideration than the first element. Because the pre-bankruptcy deposition was not tailored to a fraudulent concealment theory, the questions elicited vague answers as to whether the money deposited into Chioggia's account was Sanchez' or Chioggia's property. After this adversary case began, the Hospital deposed Sanchez again on February 23, 2023.[7] Reading of both depositions and Sanchez' judicial admissions together clarifies that the money deposited into Chioggia's account belonged to Sanchez.

Sanchez explained his income structure during his depositions. When describing the consulting fee, Sanchez testified that "[t]he money that goes into Chioggia is . . . for consulting, and monthly [he] received some money from the - - the apartments" through Finek or FMI. Sanchez Dep. 68:7-11, June 29, 2021. During the same deposition, Sanchez confirmed Finek or FMI paid him money, and for his benefit, he classified it as a consulting fee instead of a distribution and sent the money to Chioggia to pay his personal expenses. Sanchez Dep. 69:8-14; 70:6-11, June 29, 2021. When questioned about income reported on his Schedules, Sanchez testified on February 22, 2023, that the reported income is the same income he received and classified as a consulting fee. Sanchez Dep. 64:1-11, Feb. 22, 2022. Sanchez elaborated that he classified the income as a consulting fee, on the advice of an accountant, for "tax purposes." Sanchez Dep. 34:12-18, Feb. 22, 2022. Moreover, the Sanchez MSJ admits "Sanchez testified that he receives consulting income from two entities, Finek and FMI which are involved monthly for consulting." (ECF No. 29 at 5 (undisputed fact 6)). Because Sanchez' testimony and admissions state that Finek and FMI

---

[7] Like the June 29, 2021 deposition transcript, both the Hospital and Sanchez attached Sanchez' February 23, 2023 testimony to their motions for summary judgment. Again, the Hospital attached excerpts, but Sanchez attached the full transcript. The Court will continue to cite to the transcript generally instead of referring to the Hospital's or Sanchez' exhibit specifically.

paid him the money at issue as a consulting fee, the money is property of the debtor.

## C. Concealment

The Hospital has also established that Sanchez concealed this income by depositing it into Chioggia's bank account. "Concealing property for purposes of section 727(a)(2)(A) can be accomplished by a transfer of title coupled with retention of the benefits of ownership." *Thibodeaux v. Olivier (In re Olivier)*, 819 F.2d 550, 553 (5th Cir. 1987) (citations omitted). Again, this element is likely not in dispute because Sanchez admits that the income he received from Finek and FMI "is deposited into the bank account held by Chioggia Oil & Gas and that he uses that bank account to pay living expenses." (ECF No. 29 at 5 (undisputed fact 6)). More specifically, Sanchez testified to the following on February 22, 2023, that whenever Finek or FMI had more money than needed to cover expenses, Sanchez would write a check to Chioggia, transferring the balance to Chioggia's account. Sanchez Dep. 21:10-25, Feb. 22, 2022. Sanchez would use Chioggia's credit card to pay for his personal expenses. Sanchez Dep. 37:21-24, Feb. 22, 2022; Sanchez Dep. 64:15-23, June 29, 2021. In short, Sanchez diverted his income into an entity which "exists[] so that [he] can expense things" and then continued to use the income to pay personal expenses. Sanchez Dep. 64:15-23, June 29, 2021. Notably, Sanchez carried out the Chioggia scheme while the Hospital attempted to collect the judgment Sanchez owed the Hospital. (*See generally* Hospital's Ex. C (order confirming arbitration award, dated Jan. 21, 2021 *and* Sanchez Dep. 64:15-24, June 29, 2021(ongoing nature of Chioggia scheme)). Such activity constitutes concealment.

## D. Actual Intent to Defraud

Establishing the final element, however, is more complicated. Constructive fraudulent intent is insufficient for a § 727(a)(2) action. *Pavy v. Chastant (Matter of Chastant)*, 873 F.2d 89,

91 (5th Cir. 1989) (citation omitted). The party seeking denial of discharge must establish actual

intent. *Id.* (citation omitted). Actual intent may be inferred from the debtor's actions and may be

proven by circumstantial evidence. *Id.* (citation omitted). In the Fifth Circuit, courts look to the

following factors when evaluating actual intent to defraud:

1) A lack or inadequacy of consideration;

2) A familial or close relationship between the parties;

3) Retention of possession, benefit, or use of the property in question;

4) The financial condition of the party sought to be charged both before and after the transaction in question;

5) The existence or cumulative effect of a pattern or course of conduct after the incurring of a debt, onset of financial difficulties or threat of suits be creditors; and

6) The general chronology of the events and transactions at issue.

*See id.*

A "presumption of actual fraudulent intent necessary to bar a discharge arises when the

property is either transferred gratuitously or is transferred to relatives." *Id.* (citations omitted).

Furthermore, "retention of the use of transferred property very strongly indicates a fraudulent

motive underlying the transfer." *Id.* (citations omitted).

Federal Rule of Evidence ("FRE(s)") 301 provides that, in "a civil case, unless a federal

statute or these rules provide otherwise, the party against whom a presumption is directed has the

burden of producing evidence to rebut the presumption. But this rule does not shift the burden of

persuasion, which remains on the party who had it originally." Fed. R. Evid. 301. FRE 301 adopts

Thayer's "bursting bubble" theory of presumptions. Fed. R. Evid. 301 advisory committee's note

to 1972 amendment. Under Thayer's theory, the "presumption vanishes upon introduction of

evidence which would support a finding of the nonexistence of the presumed fact." *Id.* (citations omitted). In other words, if the party who carries the burden of persuasion produces evidence to support a finding that a basic fact relating to a presumption is true, then the presumption operates, unless the opposing party produces evidence supporting the nonexistence of the basic fact.

The Hospital argues that Sanchez' testimony evidences each badge of fraud recognized in the Fifth Circuit. However, because standing is the only defense Sanchez presented in his moving papers, the Court will focus on the presumption.

Both depositions relied upon by the Hospital detail how Sanchez would divert money from Finek and FMI to Chioggia for his personal use.

> Q (Mrs. Daniels): Okay. In 2022, when there was - - I'm sorry. In 2021, when there was money left over after paying the expenses for these units, what happened to it?
> A (Mr. Sanchez): I can't remember the amounts in 2021. But if there was - - if there ways any money left, I would take it to Chioggia.
> Q: How would it get from the P&C bank account to Chioggia?
> A: With a deposit.
> Q: Okay. So let's back up. From the P&C bank account, how would the money get taken out? Would you just go to the bank and withdraw money from the P&C bank account?
> A: No. We'll get a check from P&C to pay - - to pay Chioggia.
> Q: Okay. Would you make the check out to Chioggia?
> A: Correct.
> Q: So are you a signatory on the P&C bank account?
> A: I am.
> Q: Is anyone else a signatory?
> A: No.
> Q: And so it sounds like you made some decisions for FMI and Finek. Is that right?
> A: There's no decisions to be made. I mean, there is nothing to decide.
> Q: Well, for example, you would decide when there was – when you saw that there was excess money in the account, you would decide to write a check to Chioggia. Right?
> A: Correct.
> Q: Okay. Did you consult with anybody else when you were making that decision?
> A: No.
> Q: And, I'm sorry, I may have just asked this but is anyone else a signatory on the P&C bank account?
> A: No, nobody.

Q: And so you would write P&C or a check out of the P&C bank account, make it out to Chioggia and then go deposit it into Chioggia's bank account?
A: Correct.
Q: Are you also a signatory on Chioggia's bank account?
A: There's no Chioggia bank account right now.
Q: Back when there was a Chioggia bank account, were you a signatory?
A: Correct.
Q: Was anyone else a signatory?
A: No.

Sanchez Dep. 21:10-23:6, Feb. 22, 2023. Sanchez further testified the money transferred directly from Finek or FMI to Chioggia for "tax purposes." Sanchez Dep. 34:12-18, Feb. 22, 2023. Despite detailed descriptions of how he diverted money from Finek or FMI to Chioggia and his exclusive control of Chioggia's account, Sanchez never once described an instance where Chioggia gave consideration for the money it received.

The Court therefore finds that the Hospital produced sufficient evidence to trigger a presumption of actual intent to defraud based on lack of consideration. Sanchez has not identified a single fact to challenge the presumption; Sanchez' briefing does not even address the presumption. As such, under FRE 301, the presumption operates, and the Hospital has established actual intent.

Assuming *arguendo* that the presumption of actual intent based on lack of consideration did not apply, the Court would still find actual intent. Sanchez holds ownership interests in Finek, FMI, and Chioggia. (Case No. 21-51206, ECF No. 6 at 75). The record, including Sanchez' undisputed facts, is replete with admissions that Sanchez deposited his wages from Finek and FMI into Chioggia's account so that Chioggia could pay his expenses. This all happened while the Hospital attempted to collect its judgment against Sanchez. (*See generally* Hospital's Ex. C (order confirming arbitration award, dated Jan. 21, 2021 *and* Sanchez Dep. 64:15-24, June 29, 2021 (ongoing nature of Chioggia scheme)). Therefore, multiple badges of fraud exist to establish actual

16

intent.

Because the Hospital has produced sufficient summary judgment evidence to establish each element by a preponderance, the Court GRANTS the Hospital judgment on its § 727(a)(2) claim. The Court must therefore deny Sanchez his discharge outright. Accordingly, the Court DENIES the Sanchez MSJ with respect to the same cause of action.

### III.    § 727(a)(4)(A) — False Oaths

The Hospital also moves for summary judgment on its § 727(a)(4)(A) claim, alleging that Sanchez provided "false oaths or accounts." Section 727(a)(4) states, "(a) the court shall grant the debtor a discharge, unless— . . . (4) the debtor knowingly and fraudulently, in or in connection with the case— (A) made a false oath or account."

In order to plead a valid claim for relief under § 727(a)(4)(A), a Plaintiff must affirmatively plead the following elements: "(1) [the debtor] made a statement under oath; (2) the statement was false; (3) [the debtor] knew the statement was false; (4) [the debtor] made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case." *Cadle Co. v. Pratt (In re Pratt)*, 411 F.3d 561, 566 (5th Cir. 2005). Notably, "Bankruptcy Courts have not construed § 727(a)(4) generally to impose strict liability for the schedules and false statements." *Interfirst Bank Greenville, N.A., v. Morris (In re Morris)*, 58 B.R. 422, 427 (Bankr. N.D. Tex. 1986).

The Hospital, in summary form, alleges Sanchez lied about his income and/or other funds on his Schedules and Statement of Financial Affairs ("SOFA"). "Four months before telling the court that he earns $1,500 each month," the Hospital argues, "Defendant testified he earned up to $5,000 per month for his consulting services. (ECF No. 43 at 13 (citation omitted)). According to his own bank records, he actually received an average of $6,937.68 per monthly between October

2020 and October 2021." (*Id.*). The Hospital also alleges that Sanchez failed to disclose "many four- and five-figure deposits and transfers" because he denies they are income earned through Chioggia, while also denying they are gifts or loans. (*Id.* at 14).

Sanchez rebuts that the Hospital has failed to meet the "knowingly and fraudulently" and materiality elements of the false oath claim. (ECF No. 48 at 4-5). Sanchez specifically asserts that the Hospital has not identified a motive for his alleged intent to deceive. (*Id.*). Sanchez also argues that any misstatement he may have made was not material because it would have been the subject to inquiries by the United States Trustee ("UST") and the Chapter 7 Trustee. (*Id.* at 5). Sanchez notes that he provided all supporting information for the statements in his Schedules and SOFA to the UST, and neither the UST nor Chapter 7 Trustee pursued a false oaths claim. (*Id.*). In other words, because the trustees did not bring a false oath claim, any purported false oath is not material. (*Id.*). Notably, Sanchez cites no statute or case to support his materiality argument.

### A. Statements Under Oath

Here, the Debtor made under oath the statements which the Hospital alleges are false. Specifically, Sanchez' Schedule A, Part 2, Question 10 states that his monthly income is $1,500. (Case No. 21-51206, ECF No. 6 at 34).[8] Sanchez signed his Schedules under penalty of perjury on October 11, 2021. (*Id.* at 40). On his SOFA, Sanchez stated since January 1 on the current calendar year (2021), he had received an estimated $4,000 in income; for 2020, he stated he received an estimated $30,000 in income; and for 2019, he stated he received $6,133 in income. (*Id.* at 42). Sanchez also signed his SOFA under penalty of perjury on October 11, 2021. (*Id.* at 52). All testimony Sanchez gave in his June 29, 2021, and February 22, 2023 depositions was under oath.

---

[8] Sanchez' Schedules and SOFA from Case No. 21-51206, ECF No. 6 are attached to the Hospital's MSJ as Exhibit F. The pages numbers on Exhibit F, however, are obscured. For ease of reference, whenever exhibits are from a docket, the Court will refer to the docket entry.

On June 29, 2021, Sanchez testified that his income "varies, sometimes two thousand, sometimes five thousand, sometimes four, sometimes nothing." Sanchez Dep. 74:13-14, June 29, 2021. Sanchez presents no factual or legal counter on this element. The Hospital has produced sufficient evidence to establish the first element.

### B. Falsity

The Hospital has also proven Sanchez' income as stated in his Schedules and SOFA is false. Notably, like the first element, Sanchez does not factually or legally dispute that the income as stated on his Schedules and SOFA is false. For good measure, the Court has independently reviewed the Hospital's Exhibits G (statements for Sanchez' personal Chase account ending in 8444), H (statements for Chioggia's account ending in 6111), and I (summary of deposits and transfers made to the accounts in Exs. G and H) and done its own math. The summary at Exhibit I accounts for $83,152.17 worth of deposits into Sanchez' personal account and Chioggia's account, which Sanchez used to his benefit, between October 6, 2020, and July 6, 2021.[9] Exhibit I provides information for only approximately 9 months. Dividing the total by 9 for the average income in months accounted for in Exhibit I equals $9,239.13. Combing through statements from October 2020 and October 2021, the Hospital calculated Sanchez' average monthly income as $6,937.68. Neither figure is in the same ballpark as the income Sanchez disclosed in his Schedules and SOFA. Both cannot be true. Therefore, the Hospital has met its burden on the falsity element.

### C. Knowledge and Fraudulent Intent

The question next becomes whether Sanchez knew his statements were false and acted with the requisite intent. Innocent mistakes and inadvertence are generally not sufficient to result in denial of a discharge. *See, e.g.,* ***Mozeika v. Townsley (In re Townsley)***, 195 B.R. 54, 65 (Bankr.

---

[9] Sanchez did not object to Exhibit I, so the Court will accept the summary as accurate.

E.D. Tex. 1996) ("The denial of a discharge under § 727(a)(4)(A) cannot be imposed where the false statement was the result of a simple or honest mistake or inadvertence. Rather, to sustain an objection to discharge under this section, the debtor must have willfully made a false statement with intent to defraud his creditors."). Nevertheless, a debtor need not have acted deliberately to deceive. *Beaubouef*, 966 F.2d at 178 ("It makes no difference that [the debtor] does not intend to injure his creditors when he makes a false statement. Creditors are entitled to judge for themselves what will benefit, and what will prejudice, them.") (quoting ***Chalik v. Moorefield (In re Chalik)***, 748 F.2d 616, 618 (11th Cir. 1984) (per curiam)). Intent can be shown by establishing that the debtor acted with reckless disregard for the truth, which can be proven by circumstantial evidence. ***Sholdra v. Chilmark Fin. LLP (In re Sholdra)***, 249 F.3d 380, 382 (5th Cir. 2001). Reckless disregard for truth can be proven by "the existence of more than one falsehood, together with [the debtor's]. . . failure to take advantage of the opportunity to clean up all the inconsistencies and omissions when he filed his [schedules]." *Beaubouef*, 966 F.2d at 178.

Though technically separate elements, courts routinely analyze these elements together, especially when actual intent is inferentially established by showing the debtor's reckless disregard for the truth. *See, e.g. Sholdra*, 249 F.3d at 382-83 ("It is undisputed that Appellant made materially false statements in his schedules and statement of financial affairs and amended them only after his deposition confirmed the falsehood. . . We agree with the district court that Appellant made the false statements with fraudulent intent.") (citations omitted); *Beaubouef*, 966 F.2d at 178 ("However, the bankruptcy court found that the existence of more than one falsehood, together with Ronald's failure to take advantage of the opportunity to clear up all inconsistencies and omissions when he filed his amended schedules, constituted reckless indifference to the truth and, therefore, the requisite intent to deceive.") (citations omitted); *see also* 9 <u>Collier on Bankruptcy</u>

¶ 727.04[1] (16th ed. 2022) (section heading "False Oath or Account Must be Knowing and Fraudulent). Conflating knowledge and intent is appropriate because a debtor could not intend to deceive without knowing the statement is false.

Sanchez argues that the Hospital has produced no evidence of fraudulent intent. Specifically, Sanchez argues that in order to

> prevail the plaintiffs must supply sufficient evidence to ascribe a wrongful motive for Sanchez' statements regarding historical income. . . . Plaintiffs fail to identify any reason why Sanchez benefitted from misstating his income other than their perception that it was undertaking to avoid the (inapplicable) means test in Sanchez' predominately business case. . . No reasonable person would make a statement with the intent to deceive without a motive.

(ECF No. 48 at 4-5). Sanchez cites no binding case law to support his position regarding motive but relies instead on *In re Khalil*, 379 B.R. 163 (B.A.P. 9th Cir. 2007). Sanchez' footnote citing *Khalil* reads: "A false statement or omission that has no impact on a bankruptcy case is not material." (ECF No. 29 at 18). While *Khalil* indeed supports Sanchez' statement regarding materiality, *Khalil* and the cases it cites do not in any way substantiate Sanchez' position that the Hospital must allege and produce evidence to establish motive.

Contrarily, *Khalil* directly undermines the idea that a false oaths plaintiff needs to establish the debtor's motive to bar a discharge. The debtor in *Khalil*, like Sanchez here, relied on *White v. Nielsen (In re Nielsen)*[10] to argue that the plaintiff could not succeed without identifying and proving a motive. Analyzing *Nielsen*, the *Khalil* court explained that "motive could be circumstantial evidence of grounds to deny the debtors' discharge, but the Ninth Circuit never held that a motive had to be proven." *Khalil*, 379 B.R. at 176-77. As the *Khalil* court explained:

> Motive can support a finding of knowing and fraudulent intent, but it is not indispensable. A bankruptcy court might find that a debtor's reckless indifference to the truth is part of an attempt to fly 'below the trustee's radar screen,' or to protect family or friends from intrusive discovery or preference or fraudulent transfer

---

[10] 383 F.3d 922 (9th Cir. 2004).

actions, or simply to make investigation for the bankruptcy trustee or creditors. Alternatively, the court might never know the debtor's motive, but the number of misstatements or omissions, or the size and nature of a single one, might suffice to support a finding that a debtor knowingly and fraudulently made a false oath or account.

*Id.* at 176. The Court finds the reasoning in ***Khalil*** persuasive.

Motive is not an element. Motive need not be alleged or proven. What the Hospital must show is knowledge and intent to deceive. The Hospital argues that Sanchez (at least) acted with a reckless disregard for the truth.

Here, Sanchez testified to the following during his February 22, 2023 deposition:

Q (Mrs. Daniels): the very last line item where it says 8h, Other Monthly Income. Do you see that?
A (Mr. Sanchez): Correct.
Q: And you or someone typed in Finek and Chioggia?
A: Correct.
Q: The number is $1,500. Do you see that?
A: Correct.
Q: Is that the same income you tabled about earlier that – the leftover money from the P&C bank account that comes to Chioggia?
A: Correct, on this date. I mean, not – not this date but the date of the –
Q: The bankruptcy?
A: -- this form. Yes.
Q: I understand.
A: Yes. 'Cause right now it's zero. I mean, it's been zero for a long time.
Q: I understand. How did you – how did you get to this number?
A: I don't remember exactly. Just out of memory of how much I would have received back then.
Q: Okay. Did you go back through either Chioggia's bank statements or your credit card?
A: Chioggia's bank statements.
Q: Okay. To see how much income it was receiving?
A: I would think so. Yes.

Sanchez Dep. 64:1-65:1, Feb. 22, 2023. This line of inquiry continued, and Sanchez could not explain how he calculated his monthly income to report on his Schedules and SOFA.

Q (Mrs. Daniels): Okay. And did you – were you charged with doing through and calculating your monthly income?
A (Mr. Sanchez): I think I did calculate it.

Q: Okay.

A: I don't recall.

Q: Can you describe how you did that? How you calculated your –

A: No. Just looking at the statements, I guess, the bank statements.

Q: at Chioggia's bank statements or your personal bank statements?

A: I would think both.

Q: Okay. But it didn't look like you included anything from your personal bank statements in you income. Is that right?

A: If it's not here, it's not here.

Q: Okay. And so my question is why is that? It sounds like you didn't factor in anything that's in your personal bank statements when you were trying to figure out what your monthly income is?

Mr. O'Connor: Same objection. This is not a historical document.

Q (Mrs. Daniels): Do you know why that is?

A (Mr. Sanchez): No. And just for the record, I again – well, no.

Sanchez Dep. 67:11- 68:9 Feb. 22, 2023.

Sanchez provided similar answers to deposition questions about large deposits into bank accounts he controlled. Sanchez had previously testified that his friends and family often made him loans and gave him gifts. (*See, e.g.* Sanchez Dep. 74:13-14, June 29, 2021 (parents provided Sanchez—whether loaned, gifted, or advanced inheritance—with approximately $15,000 over the past two to three year period)). Yet when asked about specific large deposits, Sanchez could not recall anything regarding the transactions.

Q (Mrs. Daniels): Can you remember anyone who has sent you money, any entities or individual how has sent you $20,000 at any given time?

Mr. O'Connor: Objection, overbroad.

A (Sanchez): To this account?[11] No, I can't remember. I couldn't answer.

Q (Mrs. Daniels): You would agree that that's a – that's a lot of money, right, $20,000?

A: That's your opinion. I used to get bigger amounts from clients before. So what is a lot of money? One dollar is a lot of money for me now.

Q: Okay. And you have no idea who would have been transferring or depositing money to your Chase bank account in the amount of $20,000 in 2018?

A: I can't remember. I couldn't answer.

. . .

Q: If you will turn – so I think we're – right where you are, where that blue tab is. So we are on the statement that's dated August 17, 2018 through September 19,

---

[11] Prior questioning indicates that the questioning concerns Sanchez' personal Chase bank account. Sanchez Dep. 56:3-8, Feb. 22, 2023.

2018. Is that what you're looking at?

A: Yes. September 19th?

Q: Yes.

A: Yes.

Q: Okay. There are a few deposits and one transfer between August and September of 2018. Do you see that transfer on September 5th?

A: Yes, I do.

Q: And it says transfer from CHK and it looks like a bank account number ending in 9857. Do you see that?

A: Yes, I do.

Q: Do you know what bank account that is?

A: No. 9875? No.

Q: Any idea who would have been paying you $10,000 in September of 2018?

A: Transfer from? No.

Q: On the next page, so we're going to the bank statements for September 20, 2018 through October 17, 2018.

A: Yes, ma'am.

. . .

Q: Okay. Same – same question. Do you have any idea who would have been giving you $14,000 at once in October of 2018?

A: Can't remember. No.

Q: Can't think of anyone whose give you $14,000 at once.

A: No. Do we go to the next blue [tab]?

. . .

Q: Is that the bank statements from June 17, 2021 through July 19, 2021?

A: Correct.

Q: Okay. Here, if you go back down to deposits and additions, do you see that?

A: Yes.

Q: There's a deposit on July 6th. Do you see that?

A: Yes.

Q: Okay. And that amount is $20,400.72. Do you see that?

A: Yes.

Q: Same question here. So this was in the summer of 2021. Do you know where this money came from?

A: I would need to look at the deposit slip. I can't remember.

Q: Okay.

A: Out of my head right now.

Q: You can't remember anyone whose given you $20,000 in the last couple of years?

A: I don't remember anyone, like you said, giving me $20,000. That's a – I mean.

Sanchez Dep. 57:6-20; 58:22-59:18; 60:10-16; 60:20-61:15, Feb. 22, 2023. The Court has independently reviewed the Chase bank statements attached as the Hospital's Exhibit G and finds that they substantiate the deposits about which Sanchez was questioned. (ECF No. 43, Ex. G at 1

(July 2, 2018 deposit of $20,483.49), 6 (September 5, 2018 incoming transfer of $10,000), 7 (October 9, 2018 deposit of $14,000), and 64 (July 6, 2021 deposit of $20,400.72)).

Here, Sanchez' drastic understatement of his income coupled with his inability to explain how he calculated the lower number indicates a reckless disregard for the truth. Sanchez' failure to disclose these large deposits—regardless of whether they are loans or gifts—on his schedules further demonstrate intent to deceive. Sanchez testified that he looked at his bank statements when preparing his Schedules and SOFA, yet these documents cannot be squared with his bank statements. Sanchez cannot ignore documented reality. Disclosure and transparency are fundamental to bankruptcy administration. Considering the circumstantial evidence, the Court finds the Hospital has established knowledge and fraudulent intent.

## D. Materiality

Any false oath must also be material to justify denial of a debtor's discharge. "The subject matter of a false oath is 'material,' and thus sufficient to bar discharge, if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property." *Beaubeouf*, 966 F.2d at 178 (quoting *Chalik v. Moorefield (In re Chalik)*, 748 F.2d 616, 617 (11th Cir. 1984)). Citing *Beaubeouf*, the Bankruptcy Court for the Northern District of Texas has held that "[c]learly, any omission of income from a debtor's statements is material." *In re Crumley*, 428 B.R. 349, 360 (Bankr. N.D. Tex. 2010) (citation omitted). This Court adopted that reasoning in *Roberts*. *Hobbs v. Roberts (In re Roberts)*, 611 B.R. 261, 277-78 (Bankr. W.D. Tex. 2020). "Few, if any, assets are more material to a consumer debtor's financial affairs than a bank account, for it is from that kind of asset that the creditors can discern not only an overall picture of the debtor's financial affairs, but also the details of the debtor's finances." *Pratt*, 411 F.3d at 567 (quoting *Johnson v. Baldridge (In re*

*Baldridge)*, 256 B.R. 284, 290 (Bankr. E.D. Ark. 2000)).

Here, Sanchez significantly understated his income. Sanchez also failed to disclose large deposits, regardless of whether they are income, loans, or gifts. Sanchez' argument that "[e]ven if Sanchez is wrong about the sources and uses [of his income], this does not amount to a false oath" because there "is no link between the income information, that DHR claims is false, and administration of the estate" is plainly wrong. (ECF No. 29, at 19). The law is clear: failure to disclose income and assets within a consumer debtor's bank account(s) are material. How much money the debtor has available to him undoubtedly bears a relationship to the debtor's business transactions or estate. Sanchez's omissions and undervaluations are material.

Sanchez argues in his defense that his alleged false oaths are not material because he disclosed his financial affairs to the UST and Chapter 7 Trustee, and neither trustee took action. Sanchez cites no law to support this position. The Court cannot find any law to support his argument. The UST and Chapter 7 Trustee are not the arbiters of materiality or the finders of fact; only the Court is charged with making such a determination.

Assuming *arguendo* that Sanchez was correct, he has not properly supported it with evidence. Attached to Sanchez' MSJ at Exhibits MX-6 and MX-7 is correspondence between Sanchez' counsel and Ann Killian, a (former) auditor in the Office of the UST.

Rule 56 applies to motions for summary judgment. In 2010, the Rules Advisory Committee added subsection (c) to Rule 56 "to make clear the process for supporting assertions of fact and objecting thereto." ***Lee v. Offshore Logistical and Transport, L.L.C.***, 859 F.3d 353, 354 (citing Fed. R. Civ. P. 56, advisory committee's note to 2010 amendment). "Although the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible …, the material may be presented in a form that would not, in itself, be admissible at

trial." *Id.* (citations omitted). "The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated." Fed. R. Civ. P. 56, advisory committee's note to 2010 amendments for subdivision (c)(2).

Hearsay is an out of court statement offered for the truth of the matter asserted. Fed. R. Evid. 801(c). Hearsay, generally, is inadmissible. Fed. R. Evid. 802. Hearsay statements may only be admitted into evidence if they fit one of the exceptions outlined in FREs 803, 804, and 807. Fed. R. Evid. 803, 804, and 807.

Here, the correspondence between counsel and Ann Killian are out of court statements. In summary form, the attached correspondence relates to the UST's inquiry into Sanchez' business affairs. Ann Killian posed questions and asked for documentation, and counsel answered and produced documentation. (*See generally* Exs. MX-6, MX-7). Because Sanchez cites these statements to support his position that he "provided all supporting information for statements made in the Schedules" to the UST, and the UST did not pursue a false oath claim, the statements are offered to prove the truth of the matter asserted. (ECF No. 41 at 5). The attached correspondence is classic hearsay. Sanchez has not made any argument that the evidence could be presented in an admissible form at trial, and, without giving an advisory opinion, the Court fails to see how it could be admitted. Thus, even if his argument about the UST were a valid defense, Sanchez failed to evidentiarily support it.

Because misstatements and omissions regarding income are material, and because the Hospital has carried its burden on all other elements, the Court GRANTS summary judgment on the Hospital's false oath claim. As such, the Court denies Sanchez' discharge. Accordingly, the Court also DENIES Sanchez' MSJ.

## CONCLUSION

The Court understands the severity of denying a debtor's discharge and does not take the decision to do so lightly. The evidence proves that Sanchez purposefully directed his income to an entity beyond the Hospital's reach while the Hospital attempted to collect its judgment against him. The evidence also establishes that Sanchez undervalued his income and omitted large infusions of cash from his Schedules despite testifying he consulted his bank statements. The Bankruptcy Code does not tolerate such conduct.

IT IS THEREFORE ORDERED that Plaintiffs' Motion for Summary Judgment (ECF No. 43) is GRANTED.

IT IS FURTHER ORDERED that Defendant's Motion for Summary Judgment (ECF No. 29) is DENIED.

IT IS FURTHER ORDERED that Debtor Victor Hugo Sanchez' discharge in Bankruptcy Case No. 21-51206 is DENIED.

IT IS FURTHER ORDERED that any other relief not expressly granted here in is DENIED.

IT IS FURTHER ORDERED that Plaintiffs shall prepare a form of judgment and submit it to the Court within 14 days of entry of this order.

# # #